NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251114-U

NO. 4-25-1114

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 3, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* CARLY S., a Person Found Subject to Involuntary Admission, | ) ) ) | Appeal from the Circuit Court of Adams County |
| (The People of the State of Illinois, | ) | No. 25MH228 |
|        Petitioner-Appellee, | ) | |
|        v. | ) | Honorable |
| Carly S., | ) | John C. Wooleyhan, |
|        Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Doherty and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) This appeal from an expired order of involuntary admission is moot, and respondent has failed to carry her burden of showing the applicability of any exception to the rule against deciding moot appeals.

        (2) The appellate court may review only the judgment or parts of the judgment specified in the notice of appeal, and unspecified postjudgment matters are beyond the appellate court's jurisdiction.

¶ 2    The circuit court of Adams County entered an order authorizing the involuntary admission of respondent, Carly S., to a hospital for psychiatric treatment. Respondent appeals from that order.

¶ 3    She makes two arguments in her appeal. First, she argues that a certificate by a psychiatrist was fatally deficient in that the psychiatrist neglected to opine therein that respondent was subject to involuntary admission on an inpatient basis and that she needed immediate hospitalization. But the order of involuntary admission has expired, making this

appeal moot. The rule is that, generally, we should refrain from deciding moot appeals. Respondent has failed to carry her burden of showing that her appeal falls within any of the recognized exceptions to this rule against deciding moot appeals.

¶ 4　　　　　Second, respondent claims that defense counsel rendered ineffective assistance. Specifically, she criticizes him for failing to insist that the hospital file a treatment plan within 30 days after the involuntary admission. We lack jurisdiction, however, to consider this claim of ineffective assistance, for this claim has nothing to do with the order from which respondent appeals. Because the order of involuntary admission is the only order specified in the notice of appeal, our jurisdiction is limited to a review of that order.

¶ 5　　　　　Therefore, we dismiss this appeal on the grounds of mootness and the lack of jurisdiction.

¶ 6　　　　　　　　　　　　I. BACKGROUND

¶ 7　　　　　On September 10, 2025, respondent went to the emergency room of Blessing Hospital in Quincy, Illinois, because she had made suicidal comments to her mother. Respondent had a history of schizophrenia and had not been taking her prescribed medications.

¶ 8　　　　　Dr. Alborz Javadzadeh performed a mental status examination. Throughout his interview of respondent, she yelled at auditory hallucinations that she was experiencing. She assumed "bizarre postures" and "mov[ed] her hands around in [a] strange manner." Dr. Javadzadeh concluded that she was psychotic, that she was unable to provide for her basic needs, and that she posed a threat of harm to herself. He opined that she needed inpatient treatment.

¶ 9　　　　　On October 10, 2025, pursuant to section 3-600 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-600 (West 2024)), an inpatient intervention therapist at Blessing Hospital, Hannah Weber, petitioned for the involuntary

admission of respondent. The stated grounds of the petition were as follows. Respondent had been diagnosed with schizophrenia, and she remained psychotic. She suffered from paranoia; delusions of grandeur; and auditory, visual, and tactile hallucinations. Also, she had been homeless since July 2025, her delusions and paranoia made her unable to participate in discussions regarding how she could be safe outside the hospital, and her parents lived outside Illinois and thus were unable to provide her much support.

¶ 10 Weber's petition was accompanied by two certificates, both dated October 10, 2025. In one certificate, a licensed clinical professional counselor, Theresa Russell, opined, by the checking of boxes, that respondent was

"[a] person with mental illness who, because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed;

A person with mental illness who, because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm, without the assistance of family or others, unless treated on an inpatient basis;

A person with mental illness who: refuses treatment or is not adhering adequately to prescribed treatment; because of the nature of his or her illness is unable to understand his or her need for treatment; and if not treated on an inpatient basis, is reasonably expected based on his or her behavioral history, to suffer mental or emotional deterioration and is reasonably expected, after such deterioration, to meet the criteria of either paragraph one or paragraph two above;

- 3 -

[and]

***

*** in need of immediate hospitalization for the prevention of such harm." Under the language "I base my opinion on the following (including clinical observations, factual information):" Russell wrote:

"Patient admitted 9/10/2025 for psychosis & making suicidal statements. Patient hears distressing voices; is delusional and labile. She has been medication compliant for most part, only exception was oral Haldol, however, does not appear to improve. Today, patient continues to be psychotic, reporting auditory hallucinations and expressing paranoid delusions. Pt unable to provide for her basic needs on her own and is in need of long-term hospitalization."

Finally, at the bottom of the certificate, Russell stated, above her signature—again by checking a box—"I believe that the individual is subject to *** Involuntary inpatient admission and is in need of immediate hospitalization."

¶ 11    The second certificate, signed by Dr. Javadzadeh, subscribed to the first four propositions to which Russell had subscribed. In the space for an explanation, he opined, like Russell, that respondent was "unable to care for her basic needs due to psychosis." He left unchecked, however, the box corresponding to the preprinted language "I believe that the individual is subject to *** Involuntary inpatient admission and is in need of immediate hospitalization." No box at all was checked in the concluding "I believe" part of Dr. Javadzadeh's certificate.

¶ 12    On October 14, 2025, Dr. Javadzadeh petitioned the circuit court for an order authorizing the administration of psychotropic medications to respondent for 90 days, alleging

that she lacked the capacity to give informed consent.

¶ 13    On October 16, 2025, the circuit court appointed defense counsel and scheduled the petition for involuntary admission and the petition for involuntary administration of psychotropic medications to be heard on October 20, 2025.

¶ 14    Before the hearing on the two petitions, the State served upon defense counsel a predisposition report. (According to the file stamp on the report, the report was not filed until October 21, 2025. At the hearing of October 20, 2025, however, defense counsel acknowledged having received the report and having "reviewed it last week.") Weber was the author of the report. She wrote that respondent had "been treated on the unit and ha[d] experienced little to no change": she still suffered from "grandiose and paranoid delusions as well as auditory, visual, and tactile hallucinations." The hallucinations were "commanding and degrading," causing such distress to respondent that she cried and screamed and punched the air as if to protect herself from the hallucinations. She "lack[ed] insight into her mental illness" and showed "poor judgement in being able to keep herself safe." In Weber's opinion, "the least restrictive setting of care" for respondent would be "an involuntary court commitment to a facility of the Department of Human Services for up to 90 days to keep [respondent] safe and provide her with a higher level of care than Blessing [Hospital was] able to provide."

¶ 15    The predisposition report included a letter of October 13, 2025, from Dr. Javadzadeh, who wrote as follows:

> "[Respondent] is also continuing to demonstrate poor insight, believing that she can return and live with family members that have orders of protection against her. She reports delusions that she is trying to treat by using amphetamines to 'improve' her 'vibrations.' She has been treated for almost 30 days without using

drugs such as methamphetamines and has history of schizophrenia. Due to this, I have to conclude that symptoms are not due to substance induced psychosis and are caused by schizophrenia. She continues to exhibit these symptoms despite treatment with Depakote and two antipsychotics. Given these ongoing symptoms, I am requesting commitment for this patient to a state facility for longer term care and stability as this is the least restrictive level of care for her at this time. I am requesting admission for a state facility for her for up to 90 days if necessary.

Her past medication trials include Adderall, Clonazepam, Lorazepam, Haldol, Lithuim, Abilify and Zyprexa. She is refusing these options due to how they impacted her 'vibrations.' She has been accepting medications that we have offered her. I am going to request the court ordered medications for Quetiapine, Zoloft, and Invega that she is taking. If a higher dose of Quetiapine is not effective in improving her symptoms, I am going to request clozapine as a second line option and haloperidol as last line option to treat her."

¶ 16 On October 20, 2025, at the beginning of the hearing on the petitions, respondent's attorney noted, "The second certificate signed by Dr. Javadzadeh does not seem to indicate what my client is subject to. That might be a failing paper."

¶ 17 Without yet addressing that concern, the circuit court inquired if the State had any evidence on the petition for involuntary admission.

¶ 18 The State called Dr. Christopher Trammell, who testified that he was a psychiatrist at Blessing Hospital and that he had been in daily contact with respondent, who had been "in the adult psych unit" since September 10, 2025. His diagnosis was that respondent suffered from schizophrenia, a condition that, in her case, manifested itself through "many

intense, distressing hallucinations," "delusions," and "paranoid thoughts," such as that her family was "torturing the inside of her body" and that she was being accosted by voices. These symptoms had been causing her to cry out in distress, anger, and fear and had been depriving her of sleep. She had "a low level of hygiene" and was unable "to provide for her basic needs." Nor was she able to plan how she would obtain shelter and otherwise take care of herself outside the hospital. Her distress was so extreme that she had expressed suicidal thoughts, but she had "not been able to voice any kind specific idea" as to how she would commit suicide. Dr. Trammell did not think that respondent, if she were released, would pose a threat of harm to others. He thought, rather, that she would be "more of a harm to herself or not being able to provide for herself." She had accepted treatment with medications. "She's been on Invega Sustenna, Seroquel," Dr. Trammell testified. "We tried Depakote, Zoloft, Klonopin, Ativan. There's been multiple medications that we've prescribed." These medications had achieved "modest effects where she appeared to be in *** less acute distress from the symptoms, but she still remains very delusional with active hallucinations." Dr. Trammell recommended that respondent continue taking the prescribed medications and that she be referred to a state mental health facility for long-term treatment. Outpatient treatment was "not appropriate due to the severity of her mental illness." Dr. Trammell was asked, "And at this point, have you exhausted or come to the end of the ability of Blessing Hospital to provide services for this patient?" He answered, "Yeah. We've kind of exceeded our usual, you know, capacity to—for the way we treat patients. She might need a long-term treatment option."

¶ 19        On cross-examination, Dr. Trammell testified that respondent had been cooperative, taking her medications as recommended, although she had declined some medications.   In September 2025, when she was admitted, "she had been using substances like

amphetamine and cannabis," but since that time, she had been clear of illegal substances. She was not voicing suicidal thoughts as frequently as before. She had not been hostile or threatening toward peers or the staff, although she had "kind of lashed out, kind of indiscriminately just like yelling, upset, agitated because of the hallucinations." When asked how he knew that respondent was still hallucinating, Dr. Trammell answered:

> "Just this morning, you know, she had told me that she was getting electronic messages from her family while we were talking to her and that she hears them—it's kind of like an echo and she said she wants to have a car so she can drive away from these symptoms so she won't be able to hear them."

Dr. Trammell's impression was that respondent regarded these voices as real. The intensity of the psychotic symptoms, in Dr. Trammell's opinion, would incapacitate her from taking care of herself and maintaining her own safety, even if she had a place in which to stay—but the hospital staff had "not been able to come up with any reasonable or safe options for housing at this time."

¶ 20 At the conclusion of the hearing, the State argued it had proven its petition for involuntary admission. The State requested "[an] order that respondent be hospitalized *** at Blessing Hospital with leave to transfer to a facility of the Department of Human Services and that that would be no more than 90 days."

¶ 21 For four reasons, defense counsel objected to the proposed involuntary admission. First, Dr. Javadzadeh's certificate failed to "indicate what he believes the individual was subject to." Second, respondent had been cooperative and had shown some improvement, and "housing might alleviate a lot of the concerns." Third, defense counsel suggested that the circuit court consider "a shorter date if you were so inclined to grant the State's request today compelling something less than handing her off to a state agency, which may or may not keep her for a full

90 days." Fourth, defense counsel argued that the predisposition report was "little more than a restatement of some of the concerns rather than articulation of a plan or as to why other plans would not be successful."

¶ 22 The State responded that, in its belief, all the statutory grounds for involuntary admission were met. As for the omission in Dr. Javadzadeh's certificate, the State characterized it as merely "a scrivener's error of not checking the box" and requested that the circuit court "allow an amendment and show involuntary admission is needed for hospitalization."

¶ 23 The circuit court did not explicitly allow such an amendment. The court was unconvinced, however, that Dr. Javadzadeh's failure to check a box in his certificate should defeat the action for involuntary admission. The court reasoned:

> "To the extent that that second certificate does not have a box checked as far as what the belief is of the doctor performing that certificate, what the individual is subject to, is not fatal to the certificate itself. The certificate does show the results of the doctor's examination of the respondent and his opinion as to her mental condition. Also states his clinical observations from that examination sufficient, so that the certificate *** does advise everyone as to what his examination was and what his findings were. As far as what the individual respondent is subject to, that's actually something for the Court to decide. So the fact that no box is checked there, it does not render that certificate invalid."

Besides, the court continued, "[T]he Court can find that the predisposition report does meet the statutory requirements."

¶ 24 On the strength of the documentation as a whole and Dr. Trammell's testimony, the circuit court found as follows:

"[T]he allegations in the petition [for involuntary admission] have been proven by a clear and convincing evidence, and the respondent does currently suffer from a mental illness and because of that illness could reasonably be expected to conduct in or engage in conduct placing herself in reasonable expectation of being harmed unless receiving inpatient treatment.

And also because of her diagnosis, the respondent is currently unable to provide for her own basic physical needs without the assistance of others unless receiving inpatient treatment. Respondent is in need of immediate hospitalization for the prevention of those harms.

At this time the Court can find that the least restrictive setting for the respondent would be in a—either Blessing Hospital or a facility of the Department of Human Services for a period of time not to exceed 90 days."

Accordingly, the court decided that an "order can be entered with regard to the petition for involuntary admission." The court entered such an order.

¶ 25 After ruling in the State's favor on the petition for involuntary admission, the circuit court inquired whether there was any evidence to be presented on the petition for administration of psychotropic medications. The State again called Dr. Trammell. After he testified on that issue and the attorneys made their arguments, the court denied the petition for involuntary administration of psychotropic medications because the State had failed to prove that respondent "lack[ed] the capacity to make a reasonable decision about the [pharmaceutical] treatment."

¶ 26 On October 22, 2025, respondent appealed from the order of involuntary admission.

¶ 27        On December 12, 2025, despite the filing of the notice of appeal, the circuit court entered an order stating as follows:

> "Court being advised that the respondent has signed himself/herself into Blessing Hospital on a voluntary basis or has been discharged. People move that petition be dismissed.
>
> Motion granted. Petition is hereby dismissed."

¶ 28                        II. ANALYSIS

¶ 29                A. Vacation of the Dismissal Order

¶ 30        "Once the notice of appeal is filed, the appellate court's jurisdiction attaches immediately, and the cause of action is then beyond the jurisdiction of the trial court," except as to "matters which are collateral or incidental to the judgment" (such as sanctions, for example). *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 28. In other words, "[t]he filing of a notice of appeal divests the trial court of jurisdiction to enter further orders of substance in a cause," orders that "would modify the judgment or its scope." *Brownlow v. Richards*, 328 Ill. App. 3d 833, 836-37 (2002).

¶ 31        Respondent filed her notice of appeal on October 22, 2025. On December 12, 2025, in an order that was filed on December 15, 2025, the circuit court granted a motion by the State to dismiss an unspecified petition. (The corresponding motion for dismissal does not appear to be in the record.) Because the court had been "advised that the respondent ha[d] signed himself/herself into Blessing Hospital on a voluntary basis or ha[d] been discharged," to quote the order, we infer that the petition to be dismissed was the petition for involuntary admission. Thus, the court dismissed that petition after granting it, thereby implying rescinding the judgment of involuntary admission—or so it would seem. The dismissal order, therefore, was an

- 11 -

order of substance and, as such, was an order the court lacked jurisdiction to issue, given that, immediately upon the filing of the notice of appeal, jurisdiction over this case was removed from the circuit court and was vested in the appellate court. See *id.* An order by a court that lacks jurisdiction is a void order (*In re Adoption of Konieczny*, 2022 IL App (2d) 210333, ¶ 13), and we have a duty to vacate void orders (*Delgado v. Board of Election Commissioners of City of Chicago*, 224 Ill. 2d 481, 486 (2007)). Accordingly, we vacate the dismissal order that the circuit court signed on December 12, 2025, and filed on December 15, 2025—an order which, the State agrees, is void.

¶ 32                             B. The Mootness of This Appeal

¶ 33          The order of involuntary admission, which the circuit court entered on October 20, 2025, provided, "The period of hospitalization shall not exceed *** 90 *** days." Because those 90 days have passed, we are unable to grant effectual relief from the order of involuntary admission. We cannot turn back time and undo the operation of an order that has expired. As respondent agrees, then, this appeal is moot. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009); *Panduit Corp. v. All States Plastic Manufacturing Co.*, 84 Ill. App. 3d 1144, 1148 (1980). Generally, we decline to decide moot appeals. See *Alfred H.H.*, 233 Ill. 2d at 351.

¶ 34          C. Exceptions to the Rule Against Deciding Moot Appeals

¶ 35          Case law recognizes three exceptions to the rule against deciding moot appeals: "(1) the public-interest exception, (2) the capable-of-repetition exception, and (3) the collateral-consequences exception." (Internal quotation marks omitted.) *In re Rob W.*, 2021 IL App (1st) 200149, ¶ 50. Respondent claims that the first two exceptions apply to her appeal.

¶ 36                             1. *The Public-Interest Exception*

¶ 37          There are three criteria for application of the public-interest exception: "(1) the

public nature of the question; (2) the desirability of an authoritative determination for the purpose of guiding public officers; and (3) the likelihood that the question will recur." *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002).

¶ 38    The supreme court has held, "[T]he procedures which must be followed and the proofs that must be made before a court may authorize involuntary treatment to recipients of mental health services are matters of a public nature and of substantial public concern." *Id.* Respondent complains that, under the Code, certain procedures had to be followed in connection with her involuntary treatment at Blessing Hospital and that two of those procedures were not followed.

¶ 39    Preliminarily, to make her procedural criticisms more readily understandable, we will provide an overview of statutory procedures for the involuntary admission of persons who pose a threat of harm to themselves or others.

¶ 40    Article VI of the Mental Health and Developmental Disabilities Code (Code) (450 ILCS 5/art. VI (West 2024)) is titled "Emergency Admission by Certification" and provides for the involuntary admission of persons who need immediate hospitalization to protect themselves or others (*In re Julie M.*, 2021 IL 125768, ¶ 31). Section 3-600 provides, "A person 18 years of age or older who is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization may be admitted to a mental health facility pursuant to this Article." 405 ILCS 5/3-600 (West 2024).

¶ 41    If "a person," the "respondent," "is asserted to be subject to involuntary admission on an inpatient basis and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm," anyone who is at least 18 years old may present, "to the facility director of a mental health facility in the county where the respondent

resides or is present," a petition for the involuntary admission of the respondent. *Id.* § 3-601(a).

Along with the petition, a certificate must be presented to the facility director:

> "The petition shall be accompanied by a certificate executed by a physician, qualified examiner, psychiatrist, advanced practice psychiatric nurse, or clinical psychologist which states that the respondent is subject to involuntary admission on an inpatient basis and requires immediate hospitalization. The certificate shall indicate that the physician, qualified examiner, psychiatrist, advanced practice psychiatric nurse, or clinical psychologist personally examined the respondent not more than 72 hours prior to admission. It shall also contain the physician's, qualified examiner's, psychiatrist's, advanced practice psychiatric nurse's, or clinical psychologist's clinical observations, other factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under Section 3-208 [(*id.* § 3-208)]." *Id.* § 3-602.

This certificate is the first certificate. (As we will explain, two certificates are required.)

¶ 42    But what if no qualified professional is on hand to perform an examination and sign a certificate? Section 3-603(a) of the Code provides:

> "If no [qualified professional] is immediately available or it is not possible after a diligent effort to obtain the certificate provided for in Section 3-602 [(*id.* § 3-602)], the respondent may be detained for examination in a mental health facility upon presentation of the petition alone pending the obtaining of such a certificate." *Id.* § 3-603(a).

However, "[n]o person detained for examination under this Article on the basis of a petition alone may be held for more than 24 hours unless within that period a certificate is furnished to or

by the mental health facility. If no certificate is furnished, the respondent shall be released forthwith." *Id.* § 3-604.

¶ 43 There are further 24-hour deadlines. Within 24 hours of "admission under this Article [VI]," the facility director must file with the circuit court (1) the petition, (2) the first certificate, and (3) proof that the petition and a statement of rights were served on the respondent. *Id.* § 3-611.

¶ 44 Also, within 24 hours of "admission of a respondent pursuant to this Article [VI]," a second examination must be performed, and a second certificate must be executed. *Id.* § 3-610. Section 3-610 provides as follows (we need not quote it in its entirety):

> "As soon as possible but not later than 24 hours, excluding Saturdays, Sundays and holidays, after admission of a respondent pursuant to this Article, the respondent shall be personally examined by a psychiatrist. The psychiatrist may be a member of the staff of the facility but shall not be the person who executed the first certificate. If a certificate has already been completed by a psychiatrist following the respondent's admission, the respondent shall be examined by another psychiatrist or by a physician, clinical psychologist, advanced practice psychiatric nurse, or qualified examiner. If, as a result of this second examination, a certificate is executed, the certificate shall be promptly filed with the court. \*\*\* If the respondent is not examined or if the psychiatrist, physician, clinical psychologist, advanced practice psychiatric nurse, or qualified examiner does not execute a certificate pursuant to Section 3-602 [(*id.* § 3-602)], the respondent shall be released forthwith." *Id.* § 3-610.

"[T]he second certificate requirement ensures that a person is not held based on the opinion of a

single examiner." *In re Bonnie S.*, 2018 IL App (4th) 170227, ¶ 41. "Additionally, by requiring the examination for the first certificate to be conducted within 72 hours *before* admission and the examination for the second certificate to be conducted within 24 hours *after* admission, the statute ensures a respondent is not detained based on a mere passing episode." (Emphases in original.) *Id.*

¶ 45　　　　The facility director must "promptly file" the second certificate with the circuit court. 405 ILCS 5/3-611 (West 2024). After the filing of the petition and the two certificates, the court must hold a hearing on the petition, pursuant to article VIII of the Code, an article titled "Court Hearings" (*id.* ch. III, art. VIII). If the court finds that the State has proven, by clear and convincing evidence, that the respondent is a " '[p]erson subject to involuntary admission' " as defined in section 1-119 of the Code (*id.* § 1-119) and that involuntary admission is "the least[-]restrictive alternative," the court may issue a commitment order (*id.* § 3-811(a)), the duration of which may not exceed 90 days (*id.* § 3-813(a)). *In re Michelle L.*, 372 Ill. App. 3d 654, 659 (2007).

¶ 46　　　　"Not more than 30 days after" the respondent was involuntarily admitted "under this Article" (Article VIII), "the facility director shall file with the [circuit] court a current treatment plan." 405 ILCS 5/3-814(a) (West 2024). The purpose of requiring a treatment plan is "to ensure that the recipient is receiving adequate and humane care and services *** and to ensure that the recipient continues to meet the standards for involuntary confinement." *Id.* § 3-814(b).

¶ 47　　　　With that overview of the statutory procedures, we now consider the two procedures that, according to respondent, were not followed in her case. The first of the unfulfilled procedures is the unchecked box in Dr. Javadzadeh's certificate. Section 3-610

requires that the second certificate be "pursuant to section 3-602" (*id.* § 3-602), which, in turn, requires a statement, in the certificate, that the respondent is "subject to involuntary admission on an inpatient basis and requires immediate hospitalization." *Id.* § 3-602. The second certificate lacks such a statement. Section 3-610 provides that that if the qualified professional "does not execute a certificate pursuant to Section 3-602, the respondent shall be released forthwith." *Id.* § 3-610. Because the petition for involuntary admission was granted, however, respondent was not released forthwith.

¶ 48        The second procedure that, according to respondent, was not followed in her case was the filing of a treatment plan. The record appears to contain no treatment plan, which, under section 3-814(a) of the Code, must be filed "[n]ot more than 30 days after admission under *** Article [VIII]." *Id.* § 3-814(a). Respondent accuses defense counsel of rendering ineffective assistance by failing to object to the lack of a treatment plan. See *In re Marcus S.*, 2022 IL App (3d) 160710, ¶ 33 (stating respondents facing involuntary commitment have the right to receive effective assistance from counsel).

¶ 49        Again, under *Mary Ann P.*, 202 Ill. 2d at 402, "the procedures which must be followed and the proofs that must be made before a court may authorize involuntary treatment to recipients of mental health services are matters of a public nature and of substantial public concern." A statement, in the second certificate, that "the respondent is subject to involuntary admission on an inpatient basis and requires immediate hospitalization" is a procedure that must be followed before involuntary admission is authorized. 405 ILCS 5/3-602 (West 2024). Therefore, the first criterion of the public-interest exception, "the public nature of the question," is met in this case. *Mary Ann P.*, 202 Ill. 2d at 402.

¶ 50        The second criterion of the public-interest exception is "the desirability of an

authoritative determination for the purpose of guiding public officers." *Id.* "Providing guidance and precedent alone is not sufficient to satisfy" this second criterion. *Minson-Minor v. Overturf*, 2024 IL App (4th) 240497-U, ¶ 24. Instead, an authoritative determination would be desirable, despite the mootness of the question, only if "the law is in disarray or there is conflicting precedent." (Internal quotation marks omitted.) *Alfred H.H.*, 233 Ill. 2d at 358. Respondent has not made us aware of the presence, in case law, of conflicting interpretations of sections 3-602 and 3-814(a). "The public interest exception is narrowly construed and requires a clear showing of each of its criteria. [Citation.] If any one of the criteria is not established, the exception may not be invoked." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 13. Absent a clear showing of the second criterion, respondent has not carried her burden of showing the applicability of the public-interest exception to the doctrine of mootness. See *People v. Madison*, 2014 IL App (1st) 131950, ¶ 12 ("Generally, a party resisting a finding of mootness has the burden to show an exception to the mootness doctrine.").

¶ 51        We turn, then, to the other exception that she invokes, the capable-of-repetition exception.

¶ 52                              2. *The Capable-of-Repetition Exception*

¶ 53        If a case "involves an event of short duration which is capable of repetition" and, yet, the shortness of its duration causes the event to evade review, the case may be heard despite its mootness. (Internal quotation marks omitted.) *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). There are two criteria for this exception to the doctrine of mootness: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.*

¶ 54        Unquestionably, the first of those criteria is met. The order of involuntary

admission was limited, in its duration, to 90 days. The order was of such a short duration that it could not have been litigated before it expired. See *Alfred H.H.*, 233 Ill. 2d at 358.

¶ 55    Therefore, the only question with respect to this exception is whether "there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Barbara H.*, 183 Ill. 2d at 491. Respondent argues that, "[g]iven [her] history of prior inpatient admissions, it is reasonable to expect that [s]he may be subject to commitment in the future." Under *Barbara H.*, that argument would seem valid. In *Barbara H.*, the supreme court reasoned:

> "The second requirement for the exception to the mootness doctrine is also present. Although Barbara H.'s current status is unknown, the record shows that she has a history of mental illness and hospitalization, including involuntary hospitalization. Given this, we believe it reasonable to expect that the same action taken against her in this case may confront her again." *Id.* at 492.

Thus, under *Barbara H.*, a history of mental illness and hospitalization, including involuntary hospitalization, satisfies the second criterion in the capable-of-repetition exception. It is true that, on the page of the record that respondent cites, there does not appear to be any indication that she has a history of *involuntary* hospitalizations. To quote the cited page of the record, however, she "reported a history of psychiatric hospitalizations at Jacksonville Hospital many years ago." It seems reasonable to expect that respondent's history of mental illness—a severe and debilitating mental illness, it appears—may result in further actions for involuntary admission, especially considering that respondent has been known to refuse some recommended medications and to cease taking prescribed medications altogether. So, although respondent's known history is not exactly like that of the respondent in *Barbara H.* (we do not know if respondent had previously

been hospitalized against her will), her case is enough like *Barbara H.* that she could use that case in support of her argument against dismissing this appeal on the grounds of mootness.

¶ 56　　　　But *Alfred H.H.* introduces a complication, as respondent acknowledges. In *Alfred H.H.*, which the supreme court decided after *Barbara H.*, the respondent made an argument similar to that of the respondent in *Barbara H.*, namely, that " 'he is likely, based on his diagnosis and history, to face the same action again—*i.e.* a petition for involuntary admission' " (*Alfred H.H.*, 233 Ill. 2d at 359), but the supreme court decided in *Alfred H.H.* that such an argument was inadequate to satisfy the second criterion of the capable-of-repetition exception (see *id.* at 360). Although the wording of the second criterion suggested it was enough that there was a "reasonable expectation" that the respondent "would be subjected to the same *action* again" (emphasis added and internal quotation marks omitted) (*id.* at 358)—meaning, in this context, another involuntary admission—*that* reasonable expectation alone, the supreme court clarified in *Alfred H.H.*, would not suffice. Rather, "there must be a substantial likelihood that the *issue* presented in the instant case, and any resolution thereof, would have some bearing on a similar *issue* presented in a subsequent case." (Emphases added.) *Id.* at 360. Respondent concedes, therefore, that "[i]t is not enough that a respondent may be subject to involuntary petitions in the future." Instead, there must be a substantial probability that an issue in the present (moot) case will reemerge in a subsequent case against the respondent. See *id.*

¶ 57　　　　Evidently, by "issue," *Alfred H.H.* meant an issue more specific than the broad issue of whether the respondent was subject to involuntary admission. Otherwise, the second criterion would have been satisfied by the respondent's argument in *Alfred H.H.* that he was likely, given his diagnosis and history, to face another petition for involuntary admission. For an example of a sufficiently specific issue, the supreme court cited a case in which the

constitutionality of a statute was challenged. See *id.* at 359-60. The supreme court noted that the respondent in *Alfred H.H.*, by contrast, did "not raise a constitutional argument or challenge the interpretation of the statute." *Id.* at 360.

¶ 58        An argument might be made in the present case that—impliedly at least—the circuit court interpreted the Code as meaning it was optional whether the qualified professional specifically stated, in the second certificate, that the respondent was subject to involuntary inpatient admission and required immediate hospitalization. In the case the supreme court cited as an example in *Alfred H.H.*, however, not only did the circuit court, in the moot case, uphold the constitutionality of a statute "that supposedly allowed a court to prohibit [a newspaper] from disclosing the name of the minor who had been charged" in a closed criminal proceeding, but "the paper was likely to seek the right to publish the name of a juvenile charged in a future case." *id.* So, it was not that the second criterion of the capable-of-repetition exception was satisfied by the mere fact that, in the moot case, a constitutional argument was made or a statute was interpreted. Rather, what satisfied the second criterion was the strong probability that, in a future case, the newspaper would have to debate that same constitutional or statutory issue again—against the headwind of a prior adverse decision. See *id.*

¶ 59        Has respondent shown a strong probability that, in a future case for her involuntary admission, she would have to reargue the necessity of the statement in the second certificate? See *id.* That issue would come up again, it would seem, only if the qualified professional again neglected to check the box next to the preprinted language, "I believe that the individual is subject to *** Involuntary inpatient admission and is in need of immediate hospitalization." There can be little doubt that Dr. Javadzadeh had such a belief regarding respondent. He merely forgot, apparently, to check the corresponding box. Surely the State is

- 21 -

correct in characterizing this omission as merely a scrivener's error. Respondent has not shown a "substantial likelihood" that, in future actions for her involuntary admission, this same scrivener's error would be repeated. *Id.*

¶ 60        Respondent asserts that "[t]he sufficiency of the certificates of examination necessarily arises in every involuntary admission case." We disagree. It is untrue that, in every involuntary admission case, the legal sufficiency of the certificates is at issue, which is to say, in genuine dispute.

¶ 61        The other claimed error in this appeal is the lack of a treatment plan, which was to be filed "[n]ot more than 30 days after admission under this Article." 450 ILCS 5/3-814(a) (West 2024). The filing of a treatment plan is a postjudgment matter: the treatment plan is to be filed "[n]ot more than 30 days *after* admission under *** Article [VIII]." (Emphasis added.) *Id.* Respondent acknowledges that, in *In re Matthew J.*, 2026 IL App (4th) 250436-U, ¶¶ 30, 32, the appellate court held that it lacked jurisdiction to address the respondent's argument that his "rights were violated *** when a treatment plan was not filed within 30 days of the trial court's involuntary admission order." The appellate court pointed out the requirement, in Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017), that the notice of appeal " 'specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court.' " *Matthew J.*, 2026 IL App (4th) 250436-U, ¶ 31. Like the notice of appeal in the present case, the notice of appeal in *Matthew J.* specified only the order of involuntary admission as the order from which the respondent appealed (*id.* ¶ 32). The appellate court observed that, under binding case law, " '[a] notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal.' " *Id.* ¶ 31 (quoting *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011)). (The appellate court added that,

besides, "an alleged violation of a respondent's rights occurring after an order for involuntary commitment is entered is not a basis for reversal of the commitment order." *Id.* ¶ 33.)

¶ 62　　　　While acknowledging that discussion in *Matthew J.*, respondent raises a dilemma: "there is no order that could be challenged because counsel's failure was the failure to demand the filing of a [section ]3-814 treatment plan which is a predicate to any post-judgment hearing or order related to Respondent's ongoing treatment." *Matthew J.* acknowledged that dilemma by observing, "No notice of appeal can be filed for an order not yet in existence." (Internal quotation marks omitted.) *Id.* ¶ 31. A dilemma, however, is not what confers jurisdiction on the appellate court. A notice of appeal does so, and under *General Motors Corp.*, 242 Ill. 2d at 176, we are barred from considering respondent's argument that "counsel failed to require Blessing Hospital to file a [section ]3-814 treatment plan" According to the notice of appeal, the order of October 20, 2025—the order of involuntary admission—is the only order from which respondent appeals, and the claim of ineffective assistance has nothing to do with that order.

¶ 63　　　　In sum, then, we lack jurisdiction to consider the alleged omission of a treatment plan. The remaining issue in this appeal, the problem of the unchecked box in the second certificate, is moot, and respondent has failed to show that there is an applicable exception to the rule against deciding moot issues. There is no categorical exception for civil commitment cases. See *Alfred H.H.*, 233 Ill. 2d at 363.

¶ 64　　　　　　D. Respondent's Motion for Permission to Amend Her Brief

¶ 65　　　　On March 24, 2026, after the State filed its brief (on March 10, 2026), respondent's counsel moved for permission to file an amended brief or, alternatively, an amended reply brief. According to the motion, "[r]espondent has consulted with Appellee's counsel, and they have indicated they take no position on this Motion."

¶ 66        As respondent's counsel explains in his motion, the occasion of his seeking permission to amend his brief is this. In another appeal, *In re Alissa S.*, No. 4-25-0912, which involved a different respondent, the respondent's counsel moved to withdraw from representing that respondent because the appeal seemed unarguable. On March 24, 2026, however, the appellate court denied, without prejudice, the motion to withdraw in *Alissa S.* and directed respondent's counsel to reevaluate, in the light of *In re James E.*, 207 Ill. 2d 105 (2003), the potential merits of that appeal. After reading *James E.*, respondent's counsel came to the conclusion that, in the present appeal, "an argument could have been made that [section ] 3-403 [(405 ILCS 5/3-403 (West 2024))] barred the involuntary admission in this case," considering that (1) on September 10, 2025, respondent voluntarily admitted herself into Blessing Hospital and (2) on October 10, 2025, after the voluntary admission, the hospital petitioned for her involuntary admission.

¶ 67        Section 3-403 provides as follows:

> "A voluntary recipient shall be allowed to be discharged from the facility at the earliest appropriate time, not to exceed 5 days, excluding Saturdays, Sundays[,] and holidays, after the recipient gives any treatment staff person written notice of the recipient's desire to be discharged unless the recipient either withdraws the notice in writing or unless within the 5 day period a copy of the written notice and a petition and 2 certificates conforming to the requirements of paragraph (b) of Section 3-601 [(405 ILCS 5/3-601(b) (West 2024))] and Section 3-602 [(*id.* § 3-602)] are filed with the court. Upon receipt of the petition, the court shall order a hearing to be held within 5 days, excluding Saturdays, Sundays[,] and holidays, and to be conducted pursuant to Article IX of this Chapter [(405 ILCS 5/ch. 3, art.

IX (West 2024))]. Hospitalization of the recipient may continue pending further order of the court." 405 ILCS 5/3-403 (West 2024).

¶ 68    In previous decisions, the supreme court recounted in *James E.*, it interpreted section 3-403 as providing that "involuntary commitment proceedings may not be brought against a voluntarily admitted patient unless the patient has already submitted a request for discharge" (*James E.*, 207 Ill. 2d at 110), a request that had to be in writing (*id.* at 111). The purpose of section 3-403 was to avoid discouraging those in need of psychiatric treatment from seeking treatment voluntarily. "An important means of encouraging voluntary admission is to guarantee voluntary patients the right to request their discharge." *Id.* at 110.

¶ 69    In *James E.*, though, the supreme court carved out a "narrow exception" to section 3-403. *Id.* at 114. If a nonstate hospital "can no longer adequately administer psychiatric treatment to a voluntarily admitted patient" but the patient needs further treatment to prevent self-harm or harm to others, no written request by the patient for discharge is required before the nonstate hospital may discharge the patient and initiate involuntary commitment proceedings to a state hospital. *Id.* at 113-14.

¶ 70    In her proposed amended brief, respondent argues, "There is no record that the Respondent ever made a written request for discharge." She further argues in the amended brief, "The Record is unclear as to whether there was a clear determination that Blessing Hospital could no longer treat Respondent," considering the tentative and provisional language that Dr. Trammell used in his testimony: "We would also request a referral to a state mental health facility because she *might* need long term treatment *if* she does not get better." (Emphases added.) Respondent sums up:

        "Blessing Hospital did not determine that it could not continue treating

Respondent, only that it might not be able to continue doing so. It made no effort to discharge Respondent prior to instituting involuntary commitment proceedings. The State then sought an order explicitly admitting the Respondent involuntarily to Blessing Hospital. The Trial Court's order involuntarily admitting the Respondent to Blessing Hospital was in violation of [section ] 3-403 of the Code, and must be reversed."

¶ 71    We grant respondent's motion to file the amended brief, *instanter*, since the State appears to have no objection. The trouble with the amended brief, however, is that it raises another purported reason for reversal without explaining how an exception to the doctrine of mootness allows us to reach that reason. After the expiration of the order of involuntary admission, whether section 3-403 and *James E.* permitted the entry of that order is an academic question, and we do not decide academic questions. See *People ex rel. Johnson v. Doglio*, 43 Ill. App. 3d 420, 421 (1976) ("The function of the appellate courts is not to give opinions on merely abstract or theoretical matters, but only to decide actual controversies injuriously affecting the rights of some party to the litigation and questions or cases which have become moot or academic are not a proper subject of review.").

¶ 72                              III. CONCLUSION

¶ 73    Therefore, we dismiss this appeal on the grounds of mootness and lack of jurisdiction.

¶ 74    Appeal dismissed.